1

2

3

4

5

6

7                          UNITED STATES DISTRICT COURT

8                         NORTHERN DISTRICT OF CALIFORNIA

9

10    KRISTEN SILLOWAY, et al.,                Case No. 20-cv-07400-RS

             Plaintiffs,
11

12         v.                                  **ORDER DENYING THE PARTIES'
                                               CROSS MOTIONS FOR SUMMARY
13    CITY AND COUNTY OF SAN                    JUDGMENT, DENYING THE
      FRANCISCO,                               PARTIES' CROSS MOTIONS TO
14                                             EXCLUDE EXPERT TESTIMONY,
             Defendant.                        AND DENYING DEFENDANT'S
15                                             MOTION TO DECERTIFY THE
                                               COLLECTIVE ACTION**

16

17         In this collective action, dual-status nurses employed by the City and County of San

18   Francisco ("the City") aver that the City failed to pay them overtime wages in violation of the Fair

19   Labor Standards Act ("FLSA"). *See* 29 U.S.C. § 207(a)(1). Under the FLSA, the nurses are not

20   entitled to overtime wages if they are "employed in a bona fide . . . professional capacity." 29

21   U.S.C. § 213(a). Under the implementing regulations, to be "employed in a bona fide professional

22   capacity," the employees must be "compensated on a salary . . . basis." 29 C.F.R. § 541.300(a).

23         To determine if the nurses were compensated on a salary basis, both sides have attempted

24   to summarize voluminous payroll data showing how much the opt-in nurses were paid and for

25   what. The parties brand those analyses as expert reports subject to admission under Federal Rule

26   of Evidence 702, but they are better understood as summary materials subject to the more lenient

27   requirements of Rule 1006—requirements both witnesses comfortably clear. Those reports raise a

28   material dispute of fact as to whether the nurses were compensated on a salary basis, so summary

1    judgment for either party is inappropriate.[1]

2    Finally, the City's motion to decertify the collective action is denied. Plaintiffs have

3    carried their burden to show that the nurses that have opted in to the collective action are

4    "similarly situated" within the meaning of 29 U.S.C. § 216(b).

**I. BACKGROUND**

6    A.  The Staff Nurses' Compensation Scheme

7    Plaintiffs in this case are staff nurses employed by the City in its various public health

8    facilities, including hospitals, jails, and clinics. To determine staff nurses' compensation, the City

9    must negotiate a "base salary" with the nurses' union. This base salary is incorporated into a

10   "memorandum of understanding" between the City and the union which, after approval by the San

11   Francisco Board of Supervisors, is published in the City's salary ordinance. *See Silloway v. City*

12   *and County of San Francisco*, 117 F.4th 1070, 1072–73 (9th Cir. 2024).

13   The negotiated base salary applies to full-time nurses—that is, those who expect to work

14   40 hours per week. *See Silloway*, 117 F.4th at 1073. Any nurse that chooses to work less than 40

15   hours per week is entitled to a pro-rated share of the negotiated base salary. For example, if the

16   negotiated base salary is $104,000 per year, each full-time nurse would earn $2,000 per week or

17   $4,000 every biweekly pay period. A nurse who chooses to work only 30 hours per week would

18   earn 75% of as much—$78,000 per year, $1,500 per week, and $3,000 every biweekly pay period.

19   In the jargon of the industry, that nurse is referred to as a 0.75 full-time equivalent, or 0.75 FTE

20   for short. The negotiated base salary can be converted into an implied hourly rate. In the example,

21   a nurse making $104,000 per year and working 40 hours per week for all 52 weeks in a year would

22   be, in effect, making $50 per hour.

23   Staff nurses can supplement their base earnings by working particular shifts. For example,

24

25   ───────────────
[1] This case was deemed related to another collective action in which a different group of nurses
26   asserted an identical FLSA claim. *See Litvinova, et al. v. City and County of San Francisco*, 18-
cv-01494-RS. As a result of a prior sanctions order, summary judgment was granted in that action
27   as reflected in an earlier order which does not apply to the issues here.

28

nurses who work premium shifts—like those in the evening or overnight—earn 150% of their implied hourly rate for the work. Staff nurses can also work so-called "per-diem" shifts. These are shifts the City fills on an as-needed basis to cover staffing shortfalls. *See Silloway*, 117 F.4th at 1073. Working these shifts is completely voluntary, and nurses who work them receive 125% of their implied hourly rate. *See id.* A staff nurse that also works per-diem shifts is referred to as a "dual-status" nurse. Importantly, nurses are paid 125% of their implied hourly rate for per-diem shifts regardless of how many hours they worked in the relevant week. Therefore, even a nurse who works a per-diem shift as her 41st hour will be paid 125% of her implied hourly rate, not the 150% required by the FLSA for overtime work.

Staff nurses also accumulate time in various "leave banks" while working which may be used for vacations, illnesses, and other personal absences. *See Silloway*, 117 F.4th at 1073. If a nurse works less than her full-time equivalency in a particular pay period, she can make up the shortfall using this accrued leave time. If she does not have enough accrued leave time to make up the shortfall, the City reduces her pay to reflect the time missed. *See id.*; 29 C.F.R. § 541.710 (permitting a public employer to reduce an employee's pay in accordance with time not worked, so long as that time not worked was caused by the employee).

The City processes payroll every two weeks. After computing the time worked (including per diem shifts and other premium shifts), the time drawn from leave banks, and any other unpaid leave time, it issues each nurse a paycheck. That paycheck includes an hourly pay rate.

B. Procedural History

Three dual-status staff nurses—Kristen Silloway, Christa Duran, and Brigitta Van Ewijk—filed a putative collective action against the City for violations of the FLSA. The crux of their complaint is that dual-status nurses are entitled to time-and-a-half pay whenever they work more than 40 hours in a week, even if they only do so because they pick up per-diem shifts. *See* Complaint, at 4; 29 U.S.C. § 207(a)(1). That is because, in the nurses' view, the distinction between regular work and per-diem work is artificial—both require the same work for the same employer, only the billing code changes. *See id.*

United States District Court
Northern District of California

Following discovery, the parties filed cross motions for summary judgment. *See* Dkt. 61, 62. The City argued that the nurses are exempt from the FLSA's overtime requirement because they are bona fide professionals. *See* 29 U.S.C. § 213(a)(1). The FLSA's implementing regulations set out a two-part test for determining if an employee is a bona fide professional. First, the employee must be "compensated on a salary . . . basis at not less than [$684 per week]." 29 C.F.R. §§ 541.300, 541.600.[2] Second, the employee's "primary duty" must "[r]equir[e] knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized instruction." *See id.* § 541.300(a)(2)(i). The parties agreed that the second part of the test is satisfied.

The definition of "salary basis" is set out in another provision of the regulations. Section 602(a) provides that "[a]n employee will be considered to be paid on a 'salary basis' . . . if the employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which is not subject to reduction because of variations in the quality or quantity of the work performed." 29 C.F.R. § 541.602(a).

Section 602(a) is complemented by several adjacent provisions. First, section 604(a) permits an employer to pay an employee "additional compensation"—such as bonuses, commission, and premium hourly pay—without losing the bona fide professional-capacity exemption so long as "the employment arrangement also includes a guarantee of at least the minimum weekly-required amount paid on a salary basis." 29 C.F.R. § 541.604(a). Second, section 602(b) permits all employers to reduce an employee's compensation "when an exempt employee is absent from work for one or more full days for personal reasons, other than sickness or disability." *Id.* § 541.602(b). Finally, section 710 permits public employers, like the City, to reduce an employee's compensation down to the minute if the employee is absent "for personal reasons or because of illness or injury" and either cannot use accrued leave or decides not to do so. *Id.* § 541.710. Section 710 embodies the so-called "public accountability principle," which reflects

---

[2] The minimum amount has since been raised to $1,128 per week. *See* 29 C.F.R. § 541.600(a)(2).

United States District Court
Northern District of California

"the idea that taxpayers' money should not be spent on public employees for time they are not working." *Silloway*, 117 F.4th at 1076.

Though the parties focus on whether the City has satisfied the requirements of section 602(a), the regulations establish a second path through which an employer can show that it compensates its employees on a salary basis. *See Helix Energy Sols. Grp., Inc. v. Hewitt*, 598 U.S. 39, 55 (2023). Section 604(b) provides that an employer may compute an employee's earnings on an "hourly, daily, or shift basis" without losing the professional-capacity exemption so long as the employer guarantees that its employees earn at least the minimum weekly amount required by the regulations and there is a "reasonable relationship" between the guaranteed amount and the amount actually earned. 29 C.F.R. § 541.604(b).

Ultimately, the City's argument collapses these two paths into one. In the City's view, it is proper to understand the nurses' salary top down. They earn their guaranteed annual salary as a baseline, and the only deductions to that salary are those made pursuant to the regulations. In this framing, the hourly wage listed on the nurses' paycheck is merely an accounting convenience, not a reflection of how the nurses are paid. The other way to understand the nurses' compensation is bottom up. That is, even if the presence of the hourly rate on the nurses' paycheck indicates they are paid by the hour, the nurses still earn their annual salary because the City always guarantees them the ability to work the hours corresponding to their full-time equivalency. In that way, the City's compensation scheme easily satisfies the "reasonable relationship" test in section 604(b) because the amount the nurses earn is *exactly equal* to their guaranteed annual salary, unless the nurses decide to take unpaid time off.

Regardless of which path the City invokes to satisfy the salary basis test, the upshot of the regulatory web is simple: To enjoy the refuge of the professional-capacity exemption, the City must guarantee its staff nurses the opportunity to work all the hours corresponding to their full-time equivalency. *See Silloway*, 117 F.4th at 1077. Any delta between the compensation a nurse would expect based on her full-time equivalency and that actually received must be solely due to the *nurse* deciding to take unpaid time off.

1    In its first motion for summary judgment, the City offered various pieces of evidence to

2 demonstrate that it guaranteed the nurses the opportunity to work their full-time equivalent hours.

3 First, it pointed to the memorandum of understanding and the resulting salary ordinance, both of

4 which referred to the nurses as salaried employees. *See* Dkt. 75, at 3–4. The City also produced

5 evidence indicating that references on the nurses' paychecks to an hourly rate were a mere

6 accounting convenience. *See id.*, at 6. Stephen Ponder, the Classification and Compensation

7 Director for the City's Department of Human Resources, submitted a declaration stating that the

8 hourly conversion was simply to facilitate payroll administration. *See id.*; Dkt. 61, Ponder Decl.

9 ¶ 13. Finally, the City offered deposition testimony in which multiple nurses "acknowledge[d]

10 never having been denied the right to work their scheduled shifts." Dkt. 75, at 10. Summary

11 judgment was granted for the City and denied to the nurses. *See id.*, at 12.

12    The Ninth Circuit reversed and remanded. *See Silloway*, 117 F.4th at 1072. It explained

13 that it was error to rely on what the City *said* about the nurses' compensation structure. *See id.* at

14 1077. Rather, the dispositive question was whether the employees "actually receive[d]" a fixed

15 salary on a regular cadence. *Id.* The answer to that question, the Ninth Circuit held, was left

16 unresolved by the parties' evidence. *See id.*

17    The Ninth Circuit specifically homed in on the City's expert report. That report, prepared

18 by Dr. Piling Fan and Dr. Hossein Borhani, analyzed the payroll data of 26 staff nurses employed

19 by the City. *See Silloway*, 117 F.4th at 1082. Collectively, those nurses received a paycheck

20 during 2,251 pay periods. *See id.* at 1084. However, the report revealed 72 pay periods in which

21 the nurse was credited with fewer hours than her full-time equivalency. It was unclear from the

22 expert report if those shortfalls were due to nurses taking personal leave without using accrued

23 time off (which would be permissible under section 602(b) or section 710), or if the City had

24 denied those nurses the opportunity to work their scheduled hours (which would be

25 impermissible). *See id.* at 1082. The panel remanded the case to address those factual questions.

26 *See id.* at 1088.

27    A new round of discovery followed. The City submitted an updated expert report which

attempts to address the 72 discrepancies that troubled the Ninth Circuit. *See* Dkt. 153, Borhani Decl., Ex. 1, Ex. A (Updated Borhani Report). The Updated Borhani Report concludes that "the available data indicates that staff nurses work based on fixed schedules and are consistently paid for all hours of their regular work schedules." *Id.*, at 1. The only "limited exceptions" occur, the report found, when "staff nurses are unpaid because they take leave for personal reasons and have either run out of accrued leave banks or choose to take unpaid leave." *Id.* The nurses have moved to exclude Dr. Borhani's expert report under Federal Rule of Evidence 702. *See* Dkt. 148.

The nurses submitted a rebuttal report. *See* Dkt. 147, Don Decl., Ex. 3 (Don Report). Their report is authored by Andrea Don, an attorney at Weinberg, Roger & Rosenfeld—the law firm representing the nurses. In all, Ms. Don analyzed the payroll data for 189 plaintiffs across 25,593 pay periods. *See* Dkt. 147, Don Decl., Ex. 2, at 4 (Original Don Report). She used two methods to identify pay periods in which the nurse was paid less than her full-time equivalency. The first method—which simply compared the hours worked to the nurse's full-time equivalency— revealed a shortfall in 4,041 pay periods, 15.79% of the total. *See* Don Report, at 8. The second method—which compared the sum of the hours worked and the nurse's unpaid time off to the nurse's full-time equivalency—revealed a shortfall in 1,803 pay periods, 7.04% of the total. *See id.* The City has moved to exclude the Don Report under Federal Rule of Evidence 702. *See* Dkt. 152.

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party "bears the initial responsibility of informing the district court of the basis for its motion[] and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The non-moving party must then offer evidence of such a caliber that 'a fair-minded jury could return a verdict for the [non-moving party] on the evidence presented. The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be

United States District Court
Northern District of California

insufficient.'" *United States v. Wilson*, 881 F.2d 596, 601 (9th Cir. 1989) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). "The deciding court must view the evidence, including all reasonable inferences, in favor of the non-moving party." *Reed v. Lieurance*, 863 F.3d 1196, 1204 (9th Cir. 2017). At summary judgment, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Evid. 56(c)(2).

Finally, under 29 U.S.C. § 216(b), employees may jointly litigate an FLSA violation if they are "similarly situated" and affirmatively opt in to the litigation. *See Campbell v. City of Los Angeles*, 903 F.3d 1090, 1100 (9th Cir. 2018). Though the FLSA does not itself define what it means for plaintiffs to be "similarly situated," the Ninth Circuit in *Campbell* explained that plaintiffs are "similarly situated" "to the extent [they] are alike in ways that matter to the disposition of their FLSA claims." *Id.* at 1114. In cases, as here, where the question of whether the plaintiffs are similarly situated overlaps with their claims on the merits, the legal standard resembles that applicable at summary judgment. *See id.* at 1117.

### III. DISCUSSION

The parties have filed five motions suitable for resolution at this stage. The parties' cross motions to exclude the other's (purported) expert are addressed first because resolving those motions helps guide resolution of the parties' cross motions for summary judgment. The City's motion for decertification of the collective action is addressed last.

A. <u>Cross Motions to Exclude Expert Testimony under Rule 702</u>

As explained, both parties offer payroll analysis that they style as expert reports. Both parties move to exclude the other's report, invoking conventional arguments under Federal Rule of Evidence 702 and *Daubert*. *See* 509 U.S. 579 (1993). Those arguments are largely misplaced because a close analysis of the reports reveals that they are not expert reports.

Rule 702 imposes several requirements for a witness to testify as an expert. The witnesses here fail perhaps the most fundamental of those requirements: that the proposed expert's "scientifical, technical, or other specialized knowledge will help the trier of fact to understand the

evidence or to determine a fact in issue." FRE 702(a). Start with Dr. Borhani. He states in his declaration that he is a Vice President in the Labor and Employment practice at a consulting firm. He also has a Ph.D. in Economics and his "fields of special interest include econometric and statistical analysis, economics, and computer analysis of large databases." Dkt. 153, Borhani Decl., Ex. A, at 2. That is impressive, no doubt, but it is also largely irrelevant to the task he completed here. Dr. Borhani sifted through payroll records, summarized the hours worked by the nurses in his sample, and attempted to explain any resulting shortfalls using pay codes developed by the City. He did not draw on his expertise in econometrics or computer analysis of large databases. He did not employ any intricate regression-based methods or time-series tools.

For largely the same reason, Ms. Don also cannot testify as an expert. She is an attorney that has done some wage and hour work. That may make her an expert (in a colloquial sense) on wage and hour *law*, but it does not give her any "scientific, technical, or other specialized knowledge" that would permit her to testify about the interpretation pay codes or whether the records reveal a history of impermissible deductions.

At bottom, the reason that neither Dr. Borhani nor Ms. Don utilized their expert knowledge is that the work they did does not require expertise. Both individuals simply organized payroll data by person, time period, and pay codes, and reported the results. Any accountant, HR professional, or lawyer with rudimentary arithmetic skills and enough time could have done the same.

However, the fundamental simplicity of the analysis is also the reason that both witnesses can competently testify under Rule 1006. That rule permits the admission "as evidence a summary, chart, or calculation offered to prove the content of voluminous admissible writings, records, or photographs." The testifying witness does not carry the imprimatur of an expert; he is there is to help the jury understand the upshot of records that "cannot be conveniently examined in court." *Id.*

The proposed testimony here satisfies all those requirements. First, the evidence offered is, essentially, a "summary" of underlying payroll records. FRE 1006. As explained, Dr. Borhani and Ms. Don organized the payroll data, added it up, and summarized the findings. Sure, both made

United States District Court
Northern District of California

United States District Court
Northern District of California

certain judgment calls on which pay codes to credit and which individuals to include in the sample, but all those decisions were in service of presenting an accurate summary portrayal of the underlying records. Second, the underlying payroll records are unquestionably voluminous. Ms. Don declared that she examined the payroll data of 189 opt-in nurses, which in sum consisted of 205,375 lines of payroll data. *See* Original Don Report, at 2–3. Dr. Borhani also went line by line through the nurses' pay records, only with a smaller sample size. Finally, and relatedly, the underlying records cannot be conveniently analyzed at trial. Even the most competent jury would struggle to parse hundreds of thousands of individual payroll records without some help from a witness. *See Jackson v. Am. Elec. Warfare Assocs., Inc.*, 2025 WL 1638520, at *6 (D. Md. June 9, 2025) (concluding, in an FLSA overtime case, that "a chart . . . which purports to summarize a set of pay records" can be introduced under Rule 1006); *Avery v. TEKsystems, Inc.*, 2024 WL 4281442, at *11 (N.D. Cal. Sept. 23, 2024) (finding a summary of more than 250,000 rows of data showing on what employees spent time admissible under Rule 1006); *Cencarik v. Audubon Field Sols., LLC*, 2025 WL 1124957, at *2 n.28 (E.D. La. Apr. 16, 2025) (payroll record summaries appropriately considered at summary judgment under Rule 1006).

Many of the parties' objections to the other's witness focus on the specific requirements of Rule 702, so they are effectively mooted by the recharacterization of the witnesses under Rule 1006. For instance, the City argues that Don is unqualified and that her methodology is unreliable because it lacks support in the trade literature, but those requirements do not apply to a Rule 1006 summary witness.

The remaining objections boil down to a disagreement about the reliability of the other's summary report. The City contends that the Don Report is not reliable because it is contradicted by the deposition testimony of several opt-in nurses. The nurses argue that the Updated Borhani Report is not reliable because the sample size is too small and because he cut off the data too soon. However, "[a] Rule 1006 summary . . . need not accurately reflect all the facts in the case; it merely must accurately represent the facts that it purports to summarize." *TEKsystems*, 2024 WL 4281442, at *12 (first alteration in original). Both reports do just that. They purport to summarize

United States District Court
Northern District of California

1    payroll data for certain nurses over a certain timeframe, and neither side has demonstrated that one

2    of the witnesses made any computational errors that would render the summaries inaccurate.

3        That, of course, does not mean that the jury is obligated to credit either report in deciding

4    whether the City had an actual practice of making improper deductions. Both sides are free to

5    question the other's witness about the weaknesses of his or her approach and why the results may

6    or may not be inconsistent with other evidence of impermissible deductions.

7        A.  Cross Motions for Summary Judgment

8        The dispositive question at summary judgment is whether the City had an "actual practice"

9    of making impermissible deductions. The parties' contrasting interpretations of the City's payroll

10   records—filtered through Dr. Borhani and Ms. Don's summaries—guide that analysis.

11           i.    The City's Motion

12       As explained, the Ninth Circuit reversed the prior grant of summary judgment because it

13   found that Dr. Borhani's report "revealed at least 72 employee pay periods in which the City

14   recorded staff nurses as working fewer hours than their full-time equivalencies." *Silloway*, 117

15   F.4th at 1070. The City argues that, on remand, Dr. Borhani has updated his report to explain

16   those apparent shortfalls, resolving the factual dispute identified by the Ninth Circuit in its favor.

17       These revisions do not resolve the dispute of fact. As an initial matter, Dr. Borhani fails to

18   account for six pay periods in which a discrepancy existed in his initial report. Christa Duran was

19   four hours short in the period ending November 15, 2019. Indira De Leon was two hours short in

20   the period ending July 24, 2020. Jnell Gray was one hour short in the period ending May 14, 2021,

21   four hours short in the period ending June 11, 2021, and four hours short in the period ending July

22   9, 2021. Jocelyn Madamba was one hour short in the period ending March 20, 2020. The

23   addendum to Dr. Borhani's updated report—which catalogs all the attempted reconciliations—

24   omits these periods.

25       Moreover, some of Dr. Borhani's attempts to fill in the missing data are nothing more than

26   a guess as to what happened. In three periods, Dr. Borhani coded the prior shortfall as "deposition

27   testimony of plaintiffs," or "DEPO". *See* Updated Borhani Report, at 31, 33, 53 (Kristen Silloway,

28   ORDER DENYING CROSS MOTIONS FOR SUMMARY JUDGMENT AND CROSS MOTIONS TO EXCLUDE EXPERT TESTIMONY
     CASE NO. 20-cv-07400-RS

period ending January 12, 2018; Kristen Silloway, period ending May 31, 2019; Amanda Padilla-Brainin, period ending April 20, 2018). This is not evidence that Dr. Borhani discovered in his re-review of the payroll data. It is just his assumption that the shortfall must have been caused by the nurse because the nurse "testified that she/he had the opportunity to work her/his full regularly scheduled hours." *See* Dkt. 153, Borhani Decl., Ex. 1, Ex. B (Updated Report Addendum), at 4. Even if that were a permissible way to account for a perceived shortfall, it is based on a dubious interpretation of at least one nurse's deposition testimony. Padilla-Brainin testified that she *had* received a paystub that did not "include all the compensation [she] believed [she] w[as] owed." *See* Padilla-Brainin Depo. 42:4–11.

Other portions of Dr. Borhani's methodology appear equally problematic. In at least ten pay periods, the missing hours are coded as "offset pay periods," or "OSPP." This code was used when the employee worked hours beyond her full-time equivalency in pay periods surrounding the one in which a shortfall was observed. *See* Updated Report Addendum, at 3. From that, Dr. Borhani intuited that the nurse must have chosen to work less in the shortfall pay period to "offset" the extra work she did before or after the shortfall pay period. *See id.* Again, that is not evidence of what happened. It is just Dr. Borhani's inference—an inference the jury may or may choose to adopt.

Dr. Borhani also coded six shortfall periods as "DLSV", which means that the employee worked at the beginning of daylight savings time in March (and thus worked one less hour than she would have on a typical day) and chose not to supplement that period with an hour from a leave bank. *See* Updated Report Addendum, at 3. That, however, is not a permissible deduction. Section 710 permits public agencies to make partial-pay deductions when the employee takes an "absence[] for personal reasons or because of illness or injury" and accrued leave is not used. 29 C.F.R. § 541.710. Daylight savings time is not an "absence[] for personal reasons or because of illness or injury," so it is not a permissible partial-day deduction.

The City also argues that the nurses' failure to offer an expert report on damages creates an independent basis on which to award it summary judgment. In the City's view, because this is a

1   "complex FLSA case" in which more than "simple arithmetic" is required to calculate damages,

2   the nurses cannot carry their burden to establish damages without an expert report. Dkt. 153, at 22.

3       Calculating damages here may involve *a lot* of arithmetic, but the arithmetic is still simple.

4   The inputs to the damages formula—including the number of nurses, the overtime hours worked,

5   and the applicable pay rates—are either readily discernable from the payroll records or can be

6   established through other evidence presented at trial. The City relies heavily on *Petrone v. Werner*

7   *Enterprises, Inc.*, 42 F.4th 962 (8th Cir. 2022). That case involved a class action brought under the

8   FLSA in which 55,000 trucker trainees alleged that their employer failed to compensate them for

9   short-term breaks or for time spent resting in their trucks. *See* 2020 WL 3428982, at *1 (D. Neb.

10  June 22, 2020). The district court granted the employer-defendant's motion for judgment on the

11  mandate in part because the plaintiffs did not offer a damages expert. *See id.*, at *3. The court

12  explained that calculating damages involved more than "simple arithmetic." *See id.* Indeed, the

13  task was sufficiently complicated that "even Plaintiffs' expert made significant errors which

14  rendered his first report likely inadmissible. A jury could not accurately determine damages

15  regarding the pay and time records of 55,000 class members without expert testimony in this

16  case." *Id.* The Eighth Circuit affirmed. *See* 42 F.4th at 969 ("The evidence of damages was so

17  voluminous and complicated that Plaintiffs' own expert had difficulty correctly calculating

18  damages, demonstrating that this evidence is not the type to which the jury could simply apply

19  basic math principles in order to calculate damages without the assistance of expert testimony.").

20      Though the *Petrone* decisions are somewhat unclear about what made the damages

21  calculation so cumbersome, it appears as though the jury was going to parse the payroll records of

22  all 55,000 employees to identify when they took breaks and for how long. *See* 2020 WL 3428982,

23  at *3. That is not necessary here. The City has already provided all the payroll data of all the opt-

24  in nurses. From that data, it should be relatively easy to discern how many overtime hours the

25  nurses worked. All the jury would then have to do is apply the applicable pay rate (which is not in

26  dispute).

27      Moreover, other courts have endorsed a method of calculating damages that obviates the

need for an expert to synthesize voluminous payroll data. In *Olibas v. Barclay*, the jury in an FLSA overtime case calculated damages by determining the average amount of weekly overtime that the plaintiffs worked. *See* 838 F.3d 442, 450 (5th Cir. 2016). The average the jury settled on—eighteen hours—was not a precise deduction from voluminous payroll records, it was the jury's best reconciliation of "evidence that some drivers worked less than eighteen hours and some up to thirty hours of weekly overtime." *Id.* The parties here have submitted enough evidence to permit the jury to perform a similar exercise. Therefore, summary judgment for the City on account of a lack of a damages expert is not appropriate.

ii.    The Nurses' Motion

The nurses also move for summary judgment, relying on the Don Report. Don analyzed the payroll data of 189 *Silloway* opt-in plaintiffs for the two years preceding each nurse's opt-in through December 2024. *See* Original Don Report, at 1. She declared that she was "instructed" to exclude 19 plaintiffs, though she provided no detail as to who gave her that instruction or why. Don separated each nurse's payroll data into "Paid Schedule Hours" and "Unpaid Schedule Hours." She then compared those hours to what each nurse would be expected to be paid according to her full-time equivalent status. *See id.*, at 4.

In all, Don analyzed 25,593 pay periods. The analysis revealed that in 4,041 pay periods—15.79% of the total pay periods—the nurse's "Paid Schedule Hours" were less than her full-time equivalent hours, indicating she was paid less than her purportedly guaranteed compensation. *See* Don Report, at 8. In 1,803 pay periods—7.04% of the total pay periods—the nurse's "Paid Schedule Hours" plus her "Unpaid Schedule Hours" were less than her full-time equivalent hours. *See id.* In such a period, the difference between the nurse's expected pay and her actual pay could not be explained by a recorded unpaid absence, suggesting the City docked the nurse's pay for some other impermissible reason.

Don's analysis does not resolve the factual dispute. As the City points out, the first calculation is of limited value. It reveals only that there was a difference in those periods between the hours a nurse would have been expected to work and the hours she actually did work. The

important question—unanswered by this analysis—is *why* the difference existed. Under the public accountability principle, codified in 29 C.F.R. § 541.710, the City is permitted to reduce a nurse's pay for personal leave that the nurse cannot or does not cover with accrued time in a leave bank. If that was the cause of the shortfall, the City does not lose the benefit of the professional-capacity exemption.

Don's second calculation is more relevant. By including time that was coded by the City as unpaid, it creates an inference that in those periods the City's failure to pay the nurse for her full hours was caused in part by its decision to reduce the hours the nurse was permitted to work. If that were true, the City would lose the benefit of the professional-capacity exemption. *See Silloway*, 117 F.4th at 1075 ("The employer also cannot cause the employee to miss work and receive less pay.").

That, however, is not the only permissible inference, and the City has presented enough evidence to call it into doubt. Consider two prominent examples. Don's analysis shows that Analisa Ruiz was compensated less than the sum of her worked hours and recorded unpaid hours in at least four pay periods. *See* Don Report, at 17. However, she testified at her deposition that she believes she was always guaranteed the opportunity to work her full-time equivalent hours. *See* Dkt. 153, Ex. 9, at 904 (Ruiz Depo. Tr 15:3–6 ("Q: Other than that modification,[3] were you always guaranteed 72 hours of work in your two-week pay period? A: I think so.")). Don's analysis also showed that Nichole Solis was compensated less than the sum of her worked hours and recorded unpaid hours in at least 19 pay periods. *See* Don Report, at 17. Yet Solis's testimony also indicates that the City never denied her the opportunity to work her full-time equivalent hours. *See* Dkt. 153, Ex. 9, at 1169 (Solis Depo. Tr 13:1–8 ("Q: Have you ever been instructed not to appear for a schedule [staff nurse] shift? A: No. Q: Have you ever reported for a [staff nurse] shift and sent home because there wasn't sufficient work? A: No. Q: Are you aware of any nurses

---

[3] The modification refers to a period of time in which Ruiz worked less due to a foot injury. She does not appear to testify that the City forced her to reduce her hours on account of that injury. *See* Ruiz Depo. Tr 14:14–5:2.

United States District Court
Northern District of California

who have been? A: No.")).

Suffice it to say, both sides have marshalled evidence in support of their position. The jury will be permitted to assess the credibility of that evidence and choose which to believe. All that matters at this stage is that the choice belongs to the jury.

### B. Decertification of the Collective Action

In the event it is not granted summary judgment, the City requests that the collective action be decertified and the aggrieved nurses be made to file their FLSA claims individually. As explained, a case is suitable for collective treatment under 29 U.S.C. § 216(b) if the plaintiffs are "similarly situated." In the Ninth Circuit, that requires the plaintiffs be "alike in ways that matter to the disposition of their FLSA claims." *Campbell*, 903 F.3d at 1114.

The most obvious way in which Plaintiffs are similarly situated is that they all claim injury from the same universally applicable policy: the City's decision not to pay nurses time-and-a-half overtime when they worked more than forty hours in a week. A similar theory was pressed in *Campbell*. 903 F.3d 1090. There, roughly 2,500 officers of the Los Angeles Police Department opted into two collective actions "alleging a pervasive, unwritten policy discouraging the reporting of overtime." *Id.* at 1099. Los Angeles brought a motion for decertification of the collective action, which the district court granted. *See id.* The officers' assertion of sameness stemmed from its allegation that the unwritten anti-reporting policy was applied to every police officer across the LAPD. *See id.* at 1120 ("That the policy is Department-wide is essential to the viability of the collective action, as it is the sole justification advanced for a Department-wide collective action.").

The Ninth Circuit affirmed the decertification decision because it concluded that the evidence did not support the existence of a Department-wide policy. *See id.* "Crucially," the panel explained, there was "*no* evidence of any directives, incentives, conversations, emails, or actions (such as denials of promotions) by Department leadership that could have communicated to local supervisors, implicitly or otherwise, a uniform policy against reporting small amounts of overtime." *Id.* (emphasis in original). Consequently, the panel determined that "no reasonable trier of fact could conclude that the City fostered or tolerated a tacit policy of noncompliance." *Id.* at

United States District Court
Northern District of California

1121.

  This case could hardly be more different. Not only *could* a trier of fact conclude that the City had a policy of not paying overtime wages *applicable to every single dual-status nurse*, it would have no choice but to do so. The City has basically stipulated that it did not pay nurses overtime and has instead chosen to defend this lawsuit by invoking the safe harbor of the salary-basis exemption. It is entitled to pursue that litigation strategy, but in doing so it has effectively conceded that this suit is amenable to collective treatment.

  The City contends that the nurses are not similar in a manner "material to the resolution of [their] claims," *Campbell*, 903 F.3d at 1115, because their claims will be resolved on a different basis—namely, whether they were salaried employees within the meaning of the FLSA. In essence, the City's position is that the existence of universally applicable no-overtime policy is irrelevant to the propriety of collective treatment because the existence of such a policy is not an issue for trial.

  That position meets two problems. First, it may be that the applicability of the salary-basis test is the only issue remaining for trial, but that is *precisely because* the City has declined to argue that it does not have a uniform no-overtime policy applicable to all of its staff nurses. The City cannot, in effect, stipulate to the existence of a collective policy and then rely on the lack of dispute about that policy's existence or application to defeat collective treatment.

  Second, even if the type of proof required to answer the salary-basis question is individualized, the conclusion produced by that proof is of collective consequence. That is, the jury will be asked to assess if an individual nurse received improper deductions not to decide if *that nurse* is a salaried employee, but rather to decide if the City maintained a broad policy of not compensating nurses on a salaried basis. *See Silloway*, 117 F.4th at 1078 ("Questions about the propriety of these 72 deductions leave material factual issues in dispute as to whether the City *maintained an 'actual practice'* of making improper deductions . . . plaintiffs identified evidence that creates a material dispute of fact as to whether *staff nurses* actually received a predetermined amount of compensation on a weekly or less frequent basis.") (emphasis added).

United States District Court
Northern District of California

1       The City disagrees, arguing that collective treatment is inappropriate because—even

2 assuming an "actual practice" of making improper deductions—an individualized analysis is

3 necessary to determine when and for whom the City would lose the benefit of the salary-basis

4 exemption. It is correct that the existence of an "actual practice" of impermissible deductions does

5 not automatically mean that it loses the benefit of the exemption for all employees. Under 29

6 C.F.R. § 541.603(b):

> If the facts demonstrate that the employer has an actual practice of making
> improper deductions, the exemption is lost during the time period in which the
> improper deductions were made for employees in the same job classification
> working for the same managers responsible for the actual improper deductions.
> Employees in different job classifications or who work for different managers do
> not lose their status as exempt employees.

11 *See also Watkins v. City of Montgomery, Ala.*, 775 F.3d 1280, 1284 n.1 (11th Cir. 2014).

12       However, section 603(b) has minimal bite in a case, like this, in which Plaintiffs allege the

13 existence of a universal policy. That is because the point of section 603(b) is to prevent "a windfall

14 to employees who have not even arguably been harmed by a 'policy' that a manager has never

15 applied and may never intend to apply" while protecting those employees that "may reasonably

16 believe that they would be subject to the same types of impermissible deductions made from the

17 pay of similarly situated employees." Defining and Delimiting the Exemptions, 69 Fed. Reg. 22,

18 180; *Bader-Winterwood v. Life Time Fitness, Inc.*, 566 F.3d 618, 628 (6th Cir. 2009). When a

19 policy is universally applied, all employees are "similarly situated" with respect to that policy and

20 thus "may reasonably believe that they would be subject to [it]." *Id.*

21       Despite the City's attempt to recharacterize it, the Plaintiffs' theory here is that the City

22 had a *universal* compensation policy that did not satisfy the salary-basis test. They claim that they

23 were neither paid a fixed level of compensation nor guaranteed the ability to work the hours

24 necessary to earn that compensation. As evidence, they point to *universally applicable* proof (such

25 as the memorandum of understanding and the City's published salary ordinance) as well as a

26 report summarizing payroll evidence from which a reasonable jury could infer that the City did not

27 actually compensate its nurses in the manner it is now claiming.

The City cites cases that purport to limit the loss of the salary-basis exemption to subclasses of employees, but those cases are inapplicable here. In *Strait v. Belcan Engineering Group*, for instance, a district court refused to certify a putative collective action consisting of "all current and former Belcan employees who performed contract or temporary work for Belcan's third-party clients in the United States and did not receive overtime." 911 F. Supp. 2d 709, 720 (N.D. Ill. 2012), *abrogated in part by Richards v. Eli Lilly & Co.*, 149 F.4th 901 (7th Cir. 2025). The plaintiffs there gestured at a universal policy but were unable to contradict the employer's evidence that its managers—which were scattered across many states—handled vacation time, personal leave, and weekend work in different ways. *See id.* at 727 ("[T]here is undisputed evidence that the manager or direct supervisor has discretion whether to alter an employee's work schedule to three or four 10–hour days or to include a Saturday . . . Rather than offering documents, affidavits or testimony to contradict the numerous declarations from Belcan managers from different states that they have different ways that they handle client-holidays and negative vacation, Plaintiffs cite individual instances and inconclusive data compiled by their attorney based on Belcan's records.").

*Strait* fully accords with section 603(b). Because there was no universally applicable policy that rendered the employee non-salaried, the exemption was only lost to the extent the plaintiffs worked for managers that subverted that otherwise compliant policy. Here, by contrast, the City has submitted no comparable evidence conclusively establishing that any impermissible deductions were the result of managerial discretion. True, they have submitted some declarations saying that the nurses reported to various managers and that those managers organized schedules and reported hours. *See, e.g.*, Dkt. 154, Kim Decl. ¶ 13. Those declarations do not, however, establish that the managers had any control over *how* the nurses were paid; that is, how the reported hours were interpreted by the City in deciding what was compensable and what was not. Nor do they come anywhere close to establishing that the City in any way directed the managers to guarantee the nurses the chance to work their full-time equivalent hours only for some of those managers to disobey the directive. In short, the existence of a universal policy remains very much

in dispute, making decertification inappropriate.

Though the Ninth Circuit did not squarely address the propriety of proceeding collectively, its decision makes clear that the jury is permitted to evaluate individualized payroll evidence *in order to* determine if the City had a collective compensation scheme that satisfied the salary-basis test. For instance, in its discussion of the error rate in Dr. Borhani's report, the panel emphasized that the discrepancies evidenced "a flaw in the City's accounting process resulting in recurring improper deductions." *Silloway*, 117 F.4th at 1085. Said otherwise, the panel contemplated that the jury might glean from the individualized payroll evidence something that applied across-the-board and thus put every nurse at risk of not receiving the salary they were supposedly guaranteed.

In fact, only if the impermissible deductions were the result of managerial discretion would those deductions *not* shed light on some kind of universal policy. However, that possibility seems to have been foreclosed by the Ninth Circuit's decision. In the context of evaluating the City's asserted good faith defense, the panel explained that "there is no evidence suggesting that individual people bore responsibility for the City's improper deductions [because] [t]he City used a centralized accounting system through which it calculated and distributed compensation for all staff nurses." *Silloway*, 117 F.4th at 1086. To the extent any impermissible deductions occurred, therefore, they could not be "swept under the rug as the misdeeds of a single rogue manager." *Id.* at 1087. That leaves only one role for the impermissible deductions to play: as evidence of an overarching policy of not paying the nurses a guaranteed salary.

If that were not enough, the Ninth Circuit panel also made clear that the jury is permitted to look at collective evidence in addition to individualized payroll data to discern if the City's compensation scheme satisfied the salary-basis test. The panel noted that the memorandum of understanding—which of course applies to all staff nurses—"includes provisions from which a reasonable person could conclude that the City retained the ability to cancel shifts." *Id.* If, as the City argues, the question is simply which managers impermissibly deducted a nurse's wage and when, that collective evidence would be irrelevant.

In sum, the nurses have carried their burden to show that this case is suitable for collective

United States District Court
Northern District of California

action.

### IV. CONCLUSION

For the foregoing reasons, the parties' cross motions for summary judgment (Dkt. 147, 153) are denied, the parties' cross motions to exclude expert testimony under Federal Rule of Evidence 702 (Dkt. 148, 152) are denied, and the City's motion to decertify the collective action (Dkt. 154) is denied.

The parties are ordered to attend a trial setting conference on Thursday January 22, 2026, at 10:00 am by Zoom.

**IT IS SO ORDERED**.

Dated: December 17, 2025

_____
RICHARD SEEBORG
Chief United States District Judge